**E-FILED**
Friday, 04 October, 2013  04:48:46 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| P & M DISTRIBUTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 11-3145 |
| | ) | |
| PRAIRIE FARMS DAIRY, | ) | |
| INCORPORATED, P.F.D. SUPPLY | ) | |
| CORPORATION, MULLER- | ) | |
| PINEHURST DAIRY, INC., and | ) | |
| SCHURING & SCHURING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Plaintiff P & M Distributors, Inc. has filed an Amended Complaint,

wherein it asserts various Antitrust Violations, pursuant to the Sherman Act

15 U.S.C. § 1, *et seq*., and the Clayton Act, 15 U.S.C. § 13 *et seq*.  Pending

before the Court is the Motion to Dismiss filed by Defendants Prairie

Farms Dairy, Incorporated, P.F.D. Supply Corporation, and Muller-

Pinehurst Dairy, Inc.

# I. FACTUAL ALLEGATIONS[1]

In its Amended Complaint, Plaintiff P & M Distributors, Inc. alleges that Defendants Prairie Farms Dairy ("Prairie Farms") and P.F.D. Supply Corporation ("Prairie Supply") operate a dairy product production and supply business in Illinois. These Defendants obtain milk from farmers and produce consumable dairy products and sell milk to the public through distributors such as Defendant Muller-Pinehurst, Lockwood Dairy, Hawthorn Mellody, Inc. and Cary Dairy, among others. The distributors sell the products to intermediate customers including schools, nursing homes, hospitals and retailers, through direct sales and also through sub-distributors. These intermediate customers, including supermarkets and convenience stores, then sell the dairy products to the consuming public.

From the fall of 1998 until the fall of 2007, the Plaintiff purchased Prairie Farms dairy products from one of its own distributors, Hawthorn Mellody, Inc., and resold those dairy products to schools, hospitals, nursing homes, retailers and other customers as a sub-distributor of Hawthorn

---

[1]These alleged facts are taken from the Amended Complaint. *See* Doc. No. 12.

2

Mellody, Inc., which in turn obtained the products from Prairie Farms and Prairie Supply.

Neal Rosinsky is the President of Muller-Pinehurst.  Prairie Farms owns fifty percent of Muller-Pinehurst.  The other fifty percent of Muller-Pinehurst is owned by Mid-West Dairymen's Association.

During the period from before 2004 through and after 2007, Prairie Farms controlled between 60 percent and 80 percent of the market for liquid milk and related products for elementary schools and high schools, both public and Catholic, within Cook, Lake, Will and Dupage Counties.

During the same period, Prairie Farms controlled 100 percent of the liquid milk and related products market for a group of 30 nursing homes which received management services from EKS Management and Marketing services from IIT SourceTech.  The 30 nursing homes are located within Cook, Lake, Will and Dupage Counties, Illinois.

From before 2004 through and after 2007, Prairie Farms and Prairie Supply, through William Wilberding and other agents, and Muller-Pinehurst through Neal Rosinsky and other agents and Lockwood

Enterprises, Inc.[2], through Jerry Lockwood and other agents, and Schuring & Schuring, Inc., through Duane Schuring and other agents, via a series of agreements and concerted actions conspired to maintain higher, anti-competitive milk prices for the liquid milk and related dairy product markets that Prairie Farms controlled, including but not limited to the school district market for Cook, Lake, Dupage and Will Counties and the 30 nursing home EKS Management/IIT SourceTech market described above, by prohibiting other Prairie Farms Distributors and sub-distributors from bidding on milk supply contracts for those two markets, and by requiring that any bids submitted by other distributors or sub-distributors, such as the Plaintiff, be at or above minimum, inflated price levels determined by Prairie Farms, causing the consumers in those two markets to pay higher than market prices for liquid milk and related dairy products.

At all relevant times, Schuring & Schuring, Inc. was a Prairie Farms distributor and Lockwood Enterprises was also a Prairie Farms distributor, which sold Prairie Farm milk and related dairy products to the schools and

---

[2]Lockwood Enterprises, Inc. was initially named as a Defendant, but has since been dismissed.  *See* Doc. No. 32.

4

nursing homes in the markets described above, or as sub-distributors of Muller-Pinehurst.

During this time period, and within the school district and nursing home markets described above, the Defendants agreed and conspired to inflate milk prices in the markets in which Prairie Farms had a dominant market power, by requiring that milk products be sold at prices higher than Prairie Farms milk products were being sold generally.

The Plaintiff alleges that Defendants violated the antitrust laws by conspiring to fix anti-competitive prices in the school district and nursing home markets, causing the consumers to pay inflated, higher than market prices, and by prohibiting the Plaintiff from competing to provide Prairie Farms milk products to those markets at lower prices. The Plaintiff asserts it has sustained damages based on lost sales, contracts and lost profits.

## II. DISCUSSION

### A. Legal standard

In *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), the Supreme Court addressed the pleading requirements for antitrust claims: "[A] formulaic

recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level." *Id*. at 555 (citations omitted).  Regarding the Sherman Act, "[t]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Id*. at 553 (internal quotation marks and citation omitted).  Based on these standards, a complaint alleging an antitrust claim must include "enough factual matter (taken as true) to suggest that an agreement was made." *Id*. at 556.

Additionally, the complaint must plausibly allege the existence of an antitrust injury.  *See Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010).  "[T]his requires factual allegations suggesting that the claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Id*.

On behalf of the Seventh Circuit, Judge Posner further elaborated on the pleading standard for antitrust cases:

The Court said in *Iqbal* that the "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." This is a little unclear because plausibility, probability, and possibility overlap.  Probability runs the gamut from a zero likelihood to a certainty.  What is impossible has a zero likelihood of occurring and what is plausible has a moderately high likelihood of occurring.  The fact that the allegations undergirding a claim could be true is no longer enough to save a complaint from being dismissed; the complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as "preponderance of the evidence" connote.

*In re Text Messaging Antitrust Litigation*, 630 F.3d 622, 629 (7th Cir. 2010) (internal citation omitted).

### B. Antitrust generally

Based on the allegations of the Amended Complaint, it appears the Plaintiff is alleging the Defendants violated Section 1 of the Sherman Act based on vertical restraints.  *See Miles Distributors, Inc. v. Specialty Const. Brands, Inc.*, 476 F.3d 442, 450-51 (7th Cir. 2007) (describing trade restraining agreements between firms at different levels of distribution, such as wholesaler and retailer).

A plaintiff generally must prove three things in order to prevail: (1)

7

a contract, collusion or conspiracy between the defendants; (2) which caused the unreasonable restraint of trade in the relevant market; and (3) resulted in injury to the plaintiff.  *See Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011)

The Defendants allege the Plaintiff has failed to identify any concerted action because the Defendants constitute a single entity for antitrust purposes.   The Defendants contend that the Prairie Farm Defendants cannot conspire with each other as a matter of law.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770 (1984) ("[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.").  The Defendants further assert there is not a single factual allegation that Defendants ever discussed any aspect of pricing or customer restrictions for distributors of Prairie Farms' dairy products with any other Defendant.  Because the Defendants assert the Amended Complaint is reasonably read only to assert that Prairie Farms acted unilaterally, they contend the Section 1 claim must be dismissed.

8

The Defendants further assert that Plaintiff does not allege that Prairie Farms Dairy engaged in any anticompetitive conduct because a producer is permitted to "announce suggested resale prices and refuse to deal with distributors who do not follow them." *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 901 (2007). Courts have recognized that resale price maintenance, or supplier-imposed restrictions on distributors, generally benefit interbrand competition and consumers, and thus are procompetitive. *See id.* at 890-92.

The Defendants also contend that Plaintiff's claims fail because the Plaintiff has not sufficiently alleged a relevant antitrust market, which is ordinarily necessary to assert a claim. *See Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004). "The relevant market has both a product and geographic dimension." *Id*. at 738. However, "if a plaintiff can show the rough contours of a relevant market, and show the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power in lieu of the usual showing of a precisely defined relevant

market and a monopoly market share." *Id.* at 737.

The Defendants further assert that Plaintiff lacks standing because it has not sufficiently alleged an injury. "In order to bring an antitrust claim, a plaintiff must establish that it has antitrust standing; that is, that its claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *See Tri-Gen Inc. v. International Union of Operating Engineers*, 433 F.3d 1024, 1031 (7th Cir. 2006) (internal quotation marks and citation omitted). Generally, this means plaintiffs must demonstrate consumer injury–higher prices, for example. *See id*.

C. School District Market

(1)

In Count I, the Plaintiff alleges there were antitrust violations with respect to the School District Market. In April 2006, the Plaintiff submitted a bid to School District No. 54 in Schaumburg, Illinois, bidding on a three-year contract to supply dairy products. Cary Dairy and

Lockwood Dairy, both of which are sub-distributors of Prairie Farm products for Muller-Pinehurst, also submitted bids to provide Prairie Farm dairy products to the school district. The Plaintiff's bid was low by $5,000.00.

At the time, Neal Rosinsky informed the Plaintiff that Cary Dairy was retiring to be replaced by Lockwood Dairy (both sub-distributors of Muller-Pinehurst). The Plaintiff was told it was not permitted by Prairie Farms to bid on the Schaumburg School District contract because that would drive down the price received for dairy products sold by Muller-Pinehurst and Prairie Farms. Moreover, Cary Dairy had submitted an inflated, high bid to Schaumburg schools so that Lockwood Dairy would be the low bidder and that Plaintiff would not be allowed to compete with other Prairie Farms distributors, including Muller-Pinehurst and its sub-distributors on the basis of price.

The Plaintiff further alleges that Neal Rosinsky and others falsely informed Schaumburg School District No. 54 that Plaintiff was not qualified or sufficiently experienced to handle the Prairie Farms dairy

11

products contract for the district.  The School District then awarded the contract to Lockwood Dairy, a sub-distributor of Muller-Pinehurst.

Patrick Izzo was handling the Plaintiff's day-to-day operations between April 2006 and late September or early October 2007, at which time Neal Rosinsky repeatedly told Izzo that Plaintiff would not be permitted to bid against other Prairie Farms distributors and sub-distributors for school districts within Cook, Lake, Dupage and Will Counties, Illinois, except for a few school districts with which Plaintiff already had lengthy contracts.  Prairie Farms and Muller-Pinehurst wished to maintain higher than normal prices for the consumers within that school district market, where Prairie Farms then had dominant market power.

The Plaintiff further asserts that, around May 2007, the Plaintiff prepared to submit a bid for the Romeoville, Illinois school district. Lockwood Enterprises was the Prairie Farms distributor on the existing milk supply contract, which was about to expire.  Neal Rosinsky, who was also acting on behalf of Jerry Lockwood of Lockwood Enterprises, directed the Plaintiff to submit a bid that was higher than the bid submitted by

12

Lockwood Enterprises.  In consideration thereof, Lockwood Enterprises would transfer its existing contract for the Dolton School District to the Plaintiff.  The Plaintiff, under duress, complied with this demand by submitting prices on only milk products in plastic containers (which are higher in price) and did not submit a bid for milk products contained in paper/cardboard containers (which are less expensive).  Romeoville School District awarded the new contract for milk in paper/cardboard containers to Lockwood Enterprises.  Lockwood Enterprises then refused to transfer its existing contract for the Dolton School District to the Plaintiff.

(2)

Based on the foregoing, the Plaintiff has alleged concerted action between Muller-Pinehurst, Prairie Farms, and Lockwood Enterprises.  To the extent that Defendants contend that Prairie Farms cannot conspire with Muller-Pinehurst because a wholly owned subsidiary is a single entity with its parent corporation for antitrust purposes, *see Copperweld Corp.*, 467 U.S. at  770, the Plaintiff alleges that Prairie Farms owns only 50 percent

13

of Muller-Pinehurst.[3]

From before 2004 through and after 2007, Defendants Prairie Farms, Prairie Supply, Muller-Pinehurst, and Schuring & Schuring along with Lockwood Enterprises kept consumer prices for the 30 Nursing Homes Market and for the four-county School District Market, which Prairie Farms dominated, higher than the prices for the same Prairie Farms milk products and for other milk products by other suppliers in the four-county area. The Defendants accomplished this by prohibiting the Plaintiff and other Prairie Farms distributors from submitting lower bids.

Based on the foregoing, the Plaintiffs have at least generally alleged concerted action on the part of Prairie Farms/Prairie Supply and Muller-Pinehurst, Schuring & Schuring and Lockwood Enterprises with respect to the School District and Nursing Home Markets. The Court concludes that Plaintiff's Amended Complaint has sufficiently alleged concerted action to withstand the Defendants' Motion to Dismiss on that basis.

As a result, consumers were damaged by paying higher than market

---

[3]Prairie Supply is a wholly owned subsidiary of Prairie Farms. Therefore, those two corporations constitute a single entity for antitrust purposes.

14

prices for their milk products.  The Plaintiff was damaged because it was prohibited from obtaining contracts for the Romeoville School District, the Schaumburg School District and for other school districts within the four county area, causing the Plaintiff to lose sales totaling over $1 million per year and annual profits in excess of $200,000.00, from the School District Market within the four-county area.

The Plaintiff claims that each Defendant acted intentionally to restrain the Plaintiff from competing based on price within the four counties.  Moreover, the Plaintiff was precluded from competing for business in order to maintain higher prices for the Prairie Farms milk and related products sold by the Defendants to the customers in that market. This served to increase profits to the Defendants at the expense of the consumers in that market and to the damage of the Plaintiff.

The Defendants contend that Plaintiff has failed to plead a relevant antitrust market, in that the markets are not properly defined.  Regarding the school district, the Plaintiff describes the market as "liquid milk and related products for elementary schools and high schools, both public and

Catholic," within the four-county area–Cook, Lake, Will and Dupage.

The Defendants assert the term "liquid milk and related products" is vague and ambiguous. "Related products" could include any number of items–milk, ice cream, sour cream, orange juice, etc. Moreover, there is no explanation regarding why public and Catholic middle schools or non-Catholic private elementary and high schools are excluded from the relevant market.

The term "related products" could certainly be defined more specifically. Moreover, it is unclear why other types of schools are not part of the relevant market. However, the Court concludes at this stage that Plaintiff has sufficiently alleged an antitrust market related to the school district in the four-county area.

The Defendants further assert that Plaintiff's alleged geographic market ignores commercial realities and fails to identify other actual or potential suppliers. The relevant geographic market is the "area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies." *See United States v. Phila. Nat'l Bank*, 374

16

U.S. 321, 359 (1963).

In considering a motion to dismiss, a district court can take note of commercial realties and need not accept the plaintiff's definition of the market if it is obviously inaccurate.  The Seventh Circuit explained:

> The central business district of Highland Park . . .  would have to be something of a consumer's black hole for us to think that trendy shoppers wanting better prices on designer jeans and T Shirts could not venture to other commercial areas to find them.  It doesn't take a cartographer to know that Highland Park is located in the densely populated north shore suburbs of Chicago, nor does it take a market researcher to know that "Chicagoland" is home to many shopping venues where consumers could find designer jeans and T-shirts.  By any sensible awareness of commercial reality, 42nd was swimming in a much larger competitive sea than the complaint lets on.

*42 Parallel North v. E Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002).  Here, the Plaintiff has alleged that Prairie Farms had market power in the School District (and Nursing Home) Markets within the four-county area.  It further asserts that based on price, Prairie Farms prohibits the Plaintiff from competing in those markets.

It is unknown at this time whether the Plaintiff's characterization of the market for liquid milk and related products will ultimately prove to be

17

accurate. At this stage, the Court accepts the Plaintiff's allegations as to the geographic market.

The Defendants further contend that Plaintiff has failed to allege an injury of the type the antitrust laws are designed to prevent. Upon reviewing the allegations in the Amended Complaint, the Court disagrees. The Plaintiff is alleging that school district consumers were damaged because they had to pay higher prices for milk and other dairy products, which is sufficient to establish standing via consumer injury. *See Tri-Gen, Inc.*, 433 F.3d at 1031.

### D. Nursing Home Market

The Plaintiff alleges Muller-Pinehurst either directly, or via sub-distributors, provided Prairie Farms brand dairy products to a group of about 30 nursing homes owned and/or managed by EKS Management ("EKS"). Moreover, Muller-Pinehurst paid IIT Source Tech a commission of approximately two percent of its sales and/or those of its sub-distributors, including Schuring & Schuring and Lockwood Enterprises, made to the 30 nursing homes managed or owned by EKS.

18

The Plaintiff submitted successful bids for Prairie Farms dairy products to two of the 30 nursing homes managed or owned by EKS, Burnham Healthcare and Presidential Pavilion.  The Plaintiff submitted low bids to Burnham Healthcare and Presidential Pavilion and was awarded Prairie Farms dairy products supply contracts by those two nursing homes.

Pursuant to an agreement with Prairie Farms and the other Defendants, Neal Rosinsky then ordered the Plaintiff to pay a two percent commission to IIT SourceTech on the sales it made to the Burnham Healthcare and Presidential Pavilion nursing homes.

The Plaintiff alleges starting in around April 2006, Neal Rosinsky, pursuant to an agreement with Prairie Farms and the other Defendants, advised Patrick Izzo on a number of occasions that Plaintiff could not submit Prairie Farms dairy products supply bids to any of the other 28 nursing homes owned or managed by EKS at prices lower than the bids submitted by Muller-Pinehurst and/or its sub-distributors.

Beginning in about April 2006 until early fall 2007, Neal Rosinsky, pursuant to an agreement with Prairie Farms and the other Defendants,

submitted minimum price lists to the Plaintiff for all Prairie Farms dairy products sold by the Plaintiff to either Burnham Healthcare or Presidential Pavilion, in order to prevent the Plaintiff from selling at prices lower than Muller-Pinehurst to the other 28 nursing homes in the group managed by EKS, and prohibited the Plaintiff from bidding on contracts with any of the other 28 nursing homes in the group.

Neal Rosinsky repeatedly advised Patrick Izzo that, if the Plaintiff were permitted to sell Prairie Farms dairy products to Burnham Healthcare and Presidential Pavilion at lower prices than Muller-Pinehurst was selling the same products to the other 28 nursing homes, the other 28 nursing homes would start buying from the Plaintiff at the lower prices.  According to Rosinsky, who was acting pursuant to an agreement with Prairie Farms and the other Defendants, the Plaintiff could only sell to Burnham Healthcare and Presidential Pavilion at or above minimum prices established by Prairie Farms.

Attached to the Plaintiff's Amended Complaint is a facsimile cover sheet from Neal Rosinsky to Patrick Izzo on behalf of the Plaintiff, dated

20

June 19, 2007, enclosing a two-page price list for dairy products sold to the IIT Group (the group of 30 nursing homes) after July 2, 2007. The Plaintiff claims to have received similar price lists and similar cover memos before and after June 19, 2007.

The Plaintiff alleges that if it had been allowed to bid to supply Prairie Farms liquid milk and related dairy products to the other 28 nursing homes within this group, at the approximate prices the Plaintiff was selling those products within the four-county (Will, Cook, Dupage and Lake) area, the Plaintiff would have obtained contracts to sell all the Prairie Farms liquid milk and related dairy products to all 30 nursing homes with the EKS/IIT SourceTech market. The Plaintiff claims this would have resulted in sales by the Plaintiff to the nursing homes of more than $60,000 per month, $720,000.00 per year, which would have generated profits for the Plaintiff in excess of $144,000.00 per year.

Based on this alleged conduct, the Plaintiff asserts that each Defendant has acted pursuant to a common scheme, agreement and conspiracy. Twenty-eight of the 30 nursing homes within the market paid

higher prices for milk, resulting in damages.  The Plaintiff suffered damages in excess of $144,000.00 per year due to the loss of contracts and sales.

The Plaintiff further alleges that each Defendant acted intentionally to restrain the Plaintiff from competing on the basis of price and to bar the Plaintiff from competing for business in order to maintain higher prices to the 30 nursing homes within the market dominated by Prairie Farms, thus increasing profits to the Defendants at the expense of the 30 nursing homes.

Although the Plaintiff does not explain why the Amended Complaint limits the Nursing Home Market to "a group of 30 nursing homes which received management services from EKS Management and Marketing services from IIT SourceTech" and does not include other nursing homes or similar businesses, the Amended Complaint includes a number of allegations relating to the actions of Neal Rosinsky, on behalf of the Defendants, which support the Plaintiff's assertion that it was not permitted to bid on the contracts with any of the nursing homes.  For the reasons discussed in connection with the School District Market, the Court

concludes that Plaintiff has sufficiently alleged an antitrust market with respect to the 30 nursing homes within the four- county area.

To the extent that Defendants argue that Plaintiff's allegation of harm to intraband competition alone–injury to competition for the defendant's product–is insufficient to allege harm, such allegations of resale price maintenance are to be judged by the rule of reason. *See Leegin*, 551 U.S. at 881. The Plaintiff must show that the alleged agreement has an anticompetitive effect on the applicable market. *See Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Here, the Plaintiff has alleged that Prairie Farms controlled the liquid milk and related products market for the School District Market and the Nursing Home Market in the four-county area. Based on the current record, the Court is unable to determine whether competition was unreasonably restrained.

The Court concludes that, as with the School District Market, the Plaintiff has alleged consumer injury based on its allegation that Defendants' actions have resulted in higher prices to the Nursing Home

Market.

## III. CONCLUSION

This Court recognizes that "proceeding to antitrust discovery can be expensive," *see Twombly*, 550 U.S. at 558, and thus antitrust complaints are subject to increased scrutiny "to spare defendants the expense of responding to bulky, burdensome discovery unless the complaint provides enough information to enable an inference that the suit has sufficient merit." *See Text Messaging Antitrust Litigation*, 630 F.3d at 625. While the Amended Complaint could be more specific, it does include some factual matter that it beyond mere legal conclusions and a simple recitation of the elements.

Although it is difficult to determine at this stage of the litigation whether there is a "nonnegligible probability that the claim is valid," the Court concludes that Plaintiff's Amended Complaint contains just enough allegations to withstand the Defendants' Motion to Dismiss.

Ergo, the Motion of Defendants Prairie Farms Dairy, Inc., PFD Supply Corp. and Muller-Pinehurst Dairy to Dismiss the Plaintiff's Amended Complaint [d/e 22] is DENIED.

This action is referred to United States Magistrate Judge Byron G. Cudmore for the purpose of scheduling a discovery conference.

ENTER: October 4, 2013

FOR THE COURT:

_s/Richard Mills_
Richard Mills
United States District Judge